# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CAROLINA CORREA | Case No. 25-cr-10275-LTS |

## SENTENCING MEMORANDUM OF THE UNITED STATES

Defendant Carolina Correa ("Correa" or the "defendant") played a leading role in helping Jasdrual Perez ("Perez"), her then-boyfriend and one of the biggest drug dealers in Rhode Island, launder hundreds of thousands of dollars in drug proceeds. Correa lived with Perez, benefited from the lifestyle funded by Perez's drug dealing, brainstormed ideas with Perez for laundering his drug money, and then orchestrated a multi-state scheme to launder drug proceeds through a Massachusetts company in a way where she was personally in line to earn a Chief Financial Officer title and potentially earn millions of dollars if her scheme had been successful.

For her leading role in orchestrating this sophisticated money laundering scheme to launder hundreds of thousands in drug proceeds, and for the reasons below and those to be advanced at the sentencing hearing, the government recommends that the Court sentence Correa to 66 months in custody, three years of supervised release, $350,000 in a forfeiture money judgment, a special assessment of $100, and a fine in the guideline sentencing range.

## I.    THE PRESENTENCE REPORT ("PSR")

On July 14, 2025, the defendant pleaded guilty to a one-count Information charging her with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).

### A. The Court Should Adopt the Undisputed Facts Detailed in the PSR as the Factual Findings of the Court

The uncontested facts are set forth in the PSR prepared by United States Probation

("Probation") and are not repeated in full herein. PSR ¶¶ 7-82. From at least September 2019 until at least February 2022, law enforcement from DEA, IRS, and FBI conducted a complex investigation into a large-scale drug trafficking organization based in Providence, Rhode Island led by Jasdrual ("Josh") Perez ("Perez"). During at least 2021 and 2022, the defendant, Carolina Correa, was the live-in girlfriend of Perez and resided with him in an estate in Cranston. Perez used legitimate businesses, including a nightclub in Providence, which he owned with his mother, real estate investments, Correa's trucking company, his friend's real estate company, and other financial transactions (including investments in a marijuana dispensary and purchases of real property) to conceal or launder his drug proceeds.

Based on court-authorized oral, wire, and electronic interceptions of Perez's car and phone, electronic and physical surveillance, a review of financial, toll and business records, and witness statements, investigators confirmed that Perez was looking for ways to clean his drug money. At least in late 2021/early 2022, Perez enlisted his financially savvy girlfriend, the defendant, to assist him in concealing his drug proceeds. In connection with those efforts, Correa connected with a friend ("Individual 1") who was opening a marijuana dispensary ("Marijuana Dispensary") based in Massachusetts and was seeking investors for the business. Correa knew that Individual 1, the anticipated CEO of the Marijuana Dispensary – who knew Perez was a drug dealer – would not accept a cash investment directly from Perez. PSR ¶ 42. Instead, Correa offered to find "investors" for the Marijuana Dispensary; an offer which Individual 1 believed given Correa's role as a professional fundraiser for a non-profit ("Charitable Organization").[1] *Id.*

---

[1] The government's investigation did not find any evidence of wrongdoing by the Charitable Organization nor did the investigation reveal that Correa used any actual fundraising contacts from the Charitable Organization. As such, the government is not referencing the Charitable Organization by name in this pleading.

¶¶ 42-43.  In exchange for finding these "investors," Correa would be given an ownership stake in and the title of CFO of the Marijuana Dispensary. *Id.*

In January 2022, Correa indicated that she had found "investors" in the Marijuana Dispensary. Those "investors" included a real estate investor based in North Carolina with whom Correa had a long-time personal, not professional, relationship.  Both the real estate investor and his friend agreed to use their business bank accounts for the financial transactions. As per intercepted communications, yet another friend of Correa drove approximately $350,000 in drug proceeds down to North Carolina to Correa's North Carolina-based real estate investor friends. Based on financial records, the two North Carolina investors then wired the $350,000 in two transactions, from their two separate business bank accounts, in the amount of $250,000 and $100,000, to the IOLTA account for the attorney for the Marijuana Dispensary. *Id.* ¶¶ 44-60. These funds were then transferred from the IOLTA account to the Marijuana Dispensary's business account. *Id.*

To further create an appearance of legitimacy for the concealed drug proceeds, Correa used her Charitable Organization's email account – not her personal email account – to communicate with the potential "investors" (i.e., the North Carolina-based real estate investors). *Id.* ¶¶ 59-61. Specifically, Correa exchanged loan paperwork and promissory notes in the name of the Marijuana Dispensary with Individual 1 and the purported "investors." *Id.* Correa and Perez also facilitated the laundering of an additional $100,000 of Perez's drug proceeds into the Marijuana Dispensary's bank account through the business bank account of the real estate investment company of one of Perez's Rhode Island-based friends. *Id.* ¶¶ 70-82. Like with the purported North Carolina "investors," Correa also drafted promissory notes and loan documents related to the Rhode Island man's purported investment. *Id.* Financial records also confirmed the

transfer of the money from the Rhode Island-based friend of Perez to a bank account for the Marijuana Dispensary.

## B. The Probation Department Correctly Applied the Guidelines and Properly Calculated the Guideline Sentencing Range ("GSR")

The government's sentencing recommendation is based on a careful analysis and weighing of the 18 U.S.C. § 3553(a) sentencing factors, which the government anticipates will be the focus of the upcoming sentencing hearing. Nonetheless, the Court must begin, as required, with a calculation of the GSR applicable to Correa.

As stated in the PSR, the base offense level 20 because the value of the laundered funds, that is, $450,000, is more than $250,000 but less than $550,000. PSR ¶ 87; USSG § 2S1.1(a)(2) and § 2B1.1(b)(1)(G). The offense level is increased by 6 because Correa knew that the laundered funds were proceeds of drug trafficking. PSR ¶ 88; USSG § 2S1.1(b)(1). The defendant was convicted under 18 U.S.C.§ 1956; therefore, her offense level is increased by 2. PSR ¶ 89; USSG§ 2S1.1(b)(2)(B). Because Correa enlisted a friend to drive drug proceeds from Rhode Island to North Carolina and had the funds wired through multiple third-party accounts to a Marijuana Dispensary based in Massachusetts, she engaged in sophisticated money laundering; therefore, her offense level is increased by two levels. PSR ¶ 90; USSG § 2S1.1(b)(2)(B). Correa acted as an organizer, leader, manager or supervisor by orchestrating the entire money laundering concealment process while directing and monitoring the role of players along the way; therefore, Probation correctly increased her offense level by an additional two levels. PSR ¶ 92; USSG § 3B1.1(c).

The base offense level and enhancements above, all of which are well-supported by the evidence in the PSR, add up to an adjusted offense level of 32. *See* PSR ¶ 94. With a three-level reduction for acceptance of responsibility, her total offense level is 29. With a criminal history

score of I, Correa's GSR is 87-108 months, with up to three years of supervised release, and a fine of $30,000-$900,000.

## II. THE SENTENCING FACTORS OUTLINED IN 18 U.S.C. § 3553(a) SUPPORT THE GOVERNMENT'S RECOMMENDED SENTENCE

Considering the § 3553(a) factors, a sentence of 66-months is sufficient but not greater than necessary to achieve the goals of sentencing.

### A. Nature and Circumstances of the Crime

### 1. The Symbiotic Relationship Between Drug Trafficking and Money Laundering

This Court is likely well aware of the interconnected and symbiotic relationship between drug traffickers and money launderers. This relationship must be discussed in more detail here against the backdrop of the financial and business relationship between the defendant – the money launderer – and her boyfriend, the fentanyl trafficker.

The economics of drug dealing are simple. Drug dealing generates huge illegal profits. Much of the profits from drug dealing are unusable and inherently unstable. Drug distribution produces cash that cannot be safely stored, lawfully spent, or strategically reinvested without exposing the offender to detection and seizure. As we know from the facts here, Individual 1 refused to take cash directly from Perez, the drug dealer, as an investment. But, with the sophistication and savviness of Correa, the money launderer, these constraints were removed. Money launderers, like Correa, allow drug traffickers, like Perez, to convert the illicit proceeds into usable assets, transforming a high-risk activity like drug trafficking into a sustainable enterprise. Money launderers make the dirty money durable, usable, profitable, and re-investable. Or, as Correa aptly put it: "your flip is what's gonna give you clean money." PSR ¶¶ 38-39.

When money launderers, like Correa, "clean" drug money, they are protecting and strengthening an industry – the drug trafficking industry – that directly harms millions of people.

By making drug profits usable, launderers allow drug trafficking organizations to operate like legitimate businesses. Like any legitimate business that is able to properly expand after bringing in profits, drug traffickers are able to expand their businesses and reinvest their earnings into production and distribution (as here, kilograms of fentanyl, pill presses, and fentanyl pills), recruitment of other distributors (as here, runners and local wholesale distributors), and expansion of their network of sale (as here, distributing fentanyl throughout the United States). As a fentanyl trafficker's business expands, so too do the rates of drug use, addiction, and overdose. Each dollar successfully cleaned is a dollar that can be used to move more drugs, reach more users, prolong more addictions, and yield more overdoses. Thus, to say that money laundering is a victimless crime ignores the reality of the interconnectedness of launderers to traffickers. Because Perez and Correa invested – and reinvested – Perez's drug money into various legitimate businesses, Perez was able to grow his drug trafficking organization, employ others to traffic fentanyl on his behalf, and expand the reach of his manufactured fentanyl pills throughout the United States. (Perez: "I sell drugs because I like this [the money] shit dude. . .I don't see it [drugs], I don't touch it; I only touch the money because they have to give out the money." PSR ¶¶ 76-77). Laundering thus operates as a force multiplier, magnifying the social damage caused by drugs beyond what street-level dealing alone could sustain.

Likewise, laundering reduces the risks that would otherwise deter participation in the drug trade. When drug profits are protected, criminal conduct becomes more attractive and rational from an economic standpoint. As here, Correa enjoyed the financial security of her boyfriend's drug profits and the lifestyle those profits provided for her. Additionally, money laundering undermines the effectiveness of law enforcement. Even after successful seizures and investigations, drug prosecutions unfortunately lose their deterrent value when trafficking

organizations can retain access to concealed laundered money. After significant periods of incarceration, drug traffickers can reenter society with their concealed dirty money waiting for them when they are released. With that laundered money, traffickers can start operations again or ensure that the operations continue while they are incarcerated for their drug crimes. (Perez: "If I got do 30 years. . . I got into business with her [Correa]. Like a lot of shit I was supposed to lose I didn't lose because of that woman [Correa]…we don't work like being in a relationship, we work like as…like buying shit, building shit, business wise." PSR ¶ 69). This cyclical business relationship becomes self-sustaining. Thus, the level of protection and insulation provided by money launderers, like Correa, to drug traffickers, like Perez, cannot be overstated.

## 2. The Defendant Laundered her Boyfriend's Money for her Own Long-Term Financial Benefit

Against the backdrop of the interconnected relationship between money launderers and drug traffickers is the fact that Correa led the money laundering conspiracy because she saw it as a long-term financial benefit for herself. The Marijuana Dispensary's business application was designated as a priority application because the business was submitted as a Woman-Owned Business. Correa was able to convince Individual 1 to make Correa CFO of the Marijuana Dispensary if Correa was able to successfully secure investors from her network of large-scale financial donors.

Correa's money laundering and self-dealing put her in a position to have an ownership stake and CFO role in this multi-million-dollar business. Although the investigation did not uncover any written agreement between Correa and the Marijuana Dispensary, information from the company indicates, and intercepted communications from the investigation confirm, that the parties understood that Correa would obtain approximately 13% of the company in exchange for her assistance in raising funds. If not for the Marijuana Dispensary running into financial trouble

in recent years (and if not for Correa's arrest in this case), Correa would likely have been positioned to earn millions from this scheme. The investor presentation listed the following as the Marijuana Dispensary's financial projections:

**FINANCIAL PROJECTIONS RECAP: 2022-2026**

|  | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|
| Total Revenues | $2,962,191 | $11,848,765 | $22,155,030 | $32,777,545 | $35,671,730 |
| Total Sales Tax Collected | $386,675 | $1,546,700 | $3,093,400 | $4,640,100 | $5,104,110 |
| Total Cost of Goods Sold | $1,321,290 | $3,038,001 | $5,459,724 | $6,259,269 | $6,342,544 |
| Total Expenses | $1,815,972 | $4,379,666 | $8,907,373 | $11,195,490 | $11,645,383 |
| Net Operating Income | -$410,422 | $3,925,811 | $7,277,437 | $14,829,144 | $17,242,828 |

Correa played a leadership role in orchestrating the laundering of her boyfriend's drug money because she knew that she would personally benefit from the scheme. She was expected to become the CFO of an emerging Woman-Owned Company with significant upside and got a further ownership stake in this company from which she could significantly benefit if the company were to be successful.

The financial benefit motivated Correa to take on the leadership role of the money laundering organization. The benefit led Correa to convince Individual 1 to make Correa the CFO if she could secure investments in the Marijuana Dispensary. The same financial benefit motivated Correa to find a friend to drive her boyfriend's dirty money down to North Carolina. The same financial benefit motivated Correa to convince her personal contact in North Carolina (and his friend) to use their business bank accounts to launder her boyfriend's cash in structured transactions to an IOLTA account for the Marijuana Dispensary. Clearly, Correa's leadership role in this money laundering conspiracy was driven by financial greed.

**3. Correa's Crime Exceeds a Leadership Role in Laundering her Boyfriend's Money Because It Reflects her Willingness to Engage in Continued Deceit in Business Dealings**

Correa's criminal activity far exceeded leading the concealment and laundering of $450,000 of her boyfriend's drug proceeds. It reflects her willingness to engage in continued deceit and fraud in publicly facing business transactions. For Correa to successfully launder nearly a half million dollars of her boyfriend's drug proceeds, she had to personally engage in a series of deceitful acts. After Individual 1 refused to take an investment into the Marijuana Dispensary directly from Perez, Correa needed to find another way to launder Perez's drug money through the Marijuana Dispensary. Correa and Perez agreed to conceal the drug proceeds through an indirect "investment" into the Marijuana Dispensary. To accomplish this, Correa either defrauded Individual 1 and led Individual 1 to believe that the money from the North Carolina and Rhode Island "investors" were actual legitimate investments or Correa convinced Individual 1 that they (Correa and Individual 1) would not get caught using Perez's dirty money as an investment because Correa was going to enlist others to move the cash to another state and transfer it through a series of financial transactions back to the Marijuana Dispensary.

Correa was aware her image as a fundraiser for a non-profit with relationships with large scale donors was important to the Marijuana Dispensary. Correa used her Charitable Organization's email address to create an appearance of legitimacy with the purported "investors." She created and emailed promissory notes and legal documents for the North Carolina and Rhode Island investors to "sign" to document the purported investments in and funding of the Marijuana Dispensary. She drafted emails from her Charitable Organization's email account stating: "Attached are the documents I need to bring to my attorney. Please review, sign and email back. Thank you, Carolina Correa" and described the investments as a

"loan" with promissory notes attached. Upon receiving the signed promissory notes from the "lender" side, Correa then signed these notes from the borrower side in her capacity as "Chief Financial Officer" of the Marijuana Dispensary. Correa not only used her role as a Major Gifts Officer for the Charitable Organization to legitimize the concealed drug proceeds but also used it to legitimate her relationship with the North Carolina "investors" in the eyes of Individual 1.

Correa either defrauded the purported North Carolina investors (who notably never sought the return of their purported "loans") or defrauded the Marijuana Dispensary into believing the investments were legitimate or both. What is certainly clear, is that regardless of how much either the North Carolina investors or Individual 1 actually knew about the source of the funds that traveled through their respective bank accounts, Correa intended to – at the very least – conceal her boyfriend's drug money from law enforcement.

Additionally, the trip deck for the Marijuana Dispensary served as a presentation to actual and potential investors who were to be informed that the Marijuana Dispensary was backed by legitimate funding, clean money, and a legitimate CFO. Perez's drug money was not legitimate funding nor clean money. Correa was hardly a legitimate CFO given that she knew – and personally orchestrated – the laundering of her boyfriend's drug money through the Marijuana Dispensary. Query whether actual, legitimate investors would have invested in a company where $450,000 of the funding was drug money and that drug money was provided by the drug trafficking boyfriend of the CFO.

## B. The History and Characteristics of the Defendant

### 1. The Public Image the Defendant Created of Herself

At 35-years old, the defendant likely will present herself to the Court in the exact same manner that she has presented herself to the public: as an intelligent young woman who

overcame a traumatic childhood in Colombia and has obtained independent financial success as an entrepreneur and businesswoman in the United States. She prides herself as being a college-educated, working professional with significant business contacts and financial savviness. She likely will provide the Court with all her personal and professional accolades and awards. Correa also will likely tell the Court that her "love" for Perez caused her to be short-sighted and engage in criminal activity. All these personal characteristics likely will lead Correa to request a more lenient sentence than the nature of the offense requires.

The personal traits that she will ask the Court to look at for leniency are the same ones that allowed her to deceive anticipated business partners, potential investors, and the public as she concealed her boyfriend's dirty money. By her own admission to Perez: "I have a brand, I have a professional name" PSR ¶¶ 61-62. This public image is one that Correa protects and values to this day. That said, Correa also used this image to her advantage particularly related to her ability to secure potential (sham) investors in the Marijuana Dispensary and in her anticipated role as CFO of the same. A page from the investor presentation deck, prepared by an actual investment strategy company and used by the Marijuana Dispensary exemplifies not only how Correa conveyed herself to potential investors but also how she routinely presents herself to the public as a whole:



Carolina Correa joins Lifted Luxury and will serve as CFO. Correa currently is the major gifts officer for a registered 501 (c)(3) non-profit, which focuses on building racial equity and opportunities for all Rhode Islanders. Correa has helped raise over $15 million for the organization all while overseeing the young professional affinity groups for the organization and the Young Leaders Circle (YLC), including the volunteer executive committee and the group's communications and events.

In addition to her leadership roles in the non-profit sector, Correa is also a multifaceted entrepreneur with businesses in real estate and shipping. Currently, her real estate portfolio includes vacation rental properties in Columbia and Rhode Island with plans to expand in commercial real estate market by the end of 2021. Her distribution company, Bounty Trucking, an over the road (OTR) trucking fleet, currently operates across the US.

With expertise in fundraising, business management, entrepreneurship, supply chain management, and real estate development, Correa continues to tap into her diverse business and philanthropic background to build greater economic opportunities for all Rhode Islanders. With a specific interest in increasing the number of Latina business owners across the United States, Correa continues to strive to be an example for other Latina entrepreneurs cross the country.

Fluent in Spanish, English, and Portuguese, Correa has already been named by CNN as one of its "Top 20 Young People Who Rock," and by Hispanic Magazine as a Top 15 Young Hispanic Icon of America.

Correa, who holds a BA from Assumption College in Political Science, also is a sitting board member for the Boys & Girls Club of Pawtucket, Rhode Island.

**CFO**
Carolina Correa

Correa carefully crafted a public image that signaled legitimacy to her name, her brand, and her financial transactions. With the same precision used to create this public image, Correa also revealed who she truly was in private communications and images shared with a trusted few. In intercepted communications, when she believes no one else was listening, Correa regularly described the hustle to "clean" Perez's drug money for her own financial benefit through various financial and real estate transactions. Likewise, a photograph depicted below was posted by Correa on her Instagram account and viewed by law enforcement one month after Perez's arrest and after the successful movement of $450,000 of Perez's drug proceeds. In this image, Correa flaunts and normalizes her role as a money launderer to a smaller audience:



carolinaxcorrea

Correa may try to present herself publicly as a successful fundraiser and entrepreneur, but make no mistake: she also views herself as a successful money launderer.

In actuality, Correa's background provides little explanation as to why she chose to engage in criminal activity. She grew up in a household with emotionally supportive parents, her mother and stepfather, whom she described as doing a "phenomenal job" raising her. She had the opportunity to obtain a college degree and until her arrest, worked for an internationally renowned non-profit as their major gifts officer. She does not suffer from drug or alcohol addiction nor mental health issues that are known to drive individuals to criminality. She was presented with substantial opportunities in life to engage in lawful and legitimate employment. Instead, Correa clearly decided that engaging in the laundering of her boyfriend's drug money – through various business and real estate transactions – to be the more lucrative way to financial support herself.

## 2. Correa's Criminal History Score Understates Her Criminality

The PSR scores Correa as being in criminal history category I. The government does not dispute this calculation, but the facts suggest that her criminal history score dramatically understates her criminality over the course of the money laundering conspiracy. Correa saw an opportunity in her boyfriend's drug trafficking organization to profit from it personally. Her business decisions were calculated and were largely motivated by greed, and not by life circumstance. She saw how lucrative and profitable her boyfriend's drug trafficking was and wanted to make sure that she financially benefited from it as well. In intercepts, she repeatedly uses the words "clean" and "wash" in reference to concealing and laundering Perez's dirty money.

What is more, the investigation revealed only a snapshot of the defendant's concealment of Perez's drug trafficking proceeds. As detailed in the PSR, investigators intercepted wire communication on Perez's phone for 30 days in late 2021 and intercepted wire communication on Perez's phone and oral communications in Perez's car for approximately three weeks in January to February 2022. The most damning interceptions contained in the PSR come from *less than a month of interceptions from Perez's truck*. It was during this brief window that investigators learned of Correa enlisting a friend to drive $350,000 of Perez's drug proceeds down to North Carolina to be laundered in structured transactions to the Marijuana Dispensary. It was also during this window of time that investigators learned that Correa and Perez enlisted Perez's Rhode Island-based associate to launder $100,000 of Perez's drug proceeds into the Marijuana Dispensary too.

In the same period of time, Correa's own statements make clear that the laundering of Perez's drug money was not limited to $450,000 laundered into the Marijuana Dispensary

through both the North Carolina associates ($350,000) and the Rhode Island associate ($100,000). For example, Correa *actually* had intended to launder $400,000 through the North Carolina associates and Perez was not aware of, or was unable to locate, the extra $50,000 from his mother's residence ("Yeah I don't know why the fuck I missed the fifty. My mom…" and "When you told me the extra 50G I'm like 'what the fuck you talking about?'") PSR ¶¶ 53-55. Correa told Perez that if the amount was less, they would have just "washed" or laundered less dirty money ("I would have just sent it and we would have just 'washed less'"). *Id.*

Likewise, on January 17, 2022, in a discussion about strategy related to investing Perez's drug money, Correa told Perez that "priority…should be the dispensary" and "then anything [money] that you could get from that [the Marijuana Dispensary investment], what I would do if I was you, your first properties, like, I would get rental property in Pennsylvania. And then I would do a flip, because your flip is what's gonna give you clean money. That should be your strategy." PSR ¶¶ 37-39. Additionally, during an intercept between Perez and a friend, Perez bragged about Correa by saying "[w]e bought two apartments in Colombia…we're about to buy our own few cribs in the next month" and that Correa: "owns five cribs. She owns the truck shit with me. She got two spots in Colombia; so she really owns seven…she got a good job; that bitch makes like $3,500 a week." PSR ¶¶ 40-41. Clearly, Correa knew how to invest in real estate and how to clean dirty money. She knew that investing in the Marijuana Dispensary was the easiest and quickest way to clean Perez's money and after doing so, they could purchase properties with the clean money. This level of sophistication captured in less than a month of oral interceptions shows that Correa had a lengthy history of making money off of illegal activity that is simply not captured by the investigation.

All this suggests that the scope of Correa's laundering of Perez's drug proceeds was far greater than what investigators have been able to show in this case. Correa's limited criminal history is in no way proof of a lack of criminal past – if anything, Correa's criminal history score and offense level significantly understate Correa's actual involvement in laundering Perez's money. *See generally* PSR ¶¶ 25-27; 71-74.

### 3. The Defendant's Lack of Candor About her Finances and Ties to the Perez Family are Troubling.

The defendant continues to provide misleading and incomplete information about her finances and her ties to the Perez family. As it relates to the Perez family, she continues to live at 141 Alpine Estates Drive in Cranston, Rhode Island, where she lived with Perez when he was leading his drug empire, where she lived with Perez's mother and sister when she was arrested for money laundering, and which is a property still owned by Perez's mother. Likewise, to the extent Correa may now argue for leniency because her money laundering was motivated by her love of Perez, her own words on intercepted recordings show that was hardly the case. Both acknowledged their fairly transactional relationship. Correa brought business savviness, appearance of legitimacy, and networking connections to the Marijuana Dispensary. Perez brought the dirty money that they together needed to conceal and invest. By their own admissions (PSR ¶¶67-68):

| | |
|---|---|
| CORREA: | It's not about being an Hypocrite, Eventually we, like... we need to get used to that we're not gonna be in each other's lives. |
| PEREZ: | Uh-hum. |
| CORREA: | And I feel like, because we did business together, it's really hard to separate that. |
| PEREZ: | Uh-hum. |
| CORREA: | And you think it's an Hypocrite thing, but no that's the mature thing to do, like...That's not gonna... |
| PEREZ: | Uh-hum. |
| CORREA: | We can't just continue business as usually, like, that doesn't make any sense to me. I don't know how it make sense to you. |
| PEREZ: | Not a problem. |

As to the finances, notably, Correa "refused to sign release of information as requested by the Probation Office" PSR ¶ 107. Thus, any financial information provided by her could not be verified. At the time of her arrest in November 2023, Correa reported to pretrial services that she owned four real estate properties, two trailers, and one truck. Three of the real estate properties – 2212 Mackinaw Street and 1411 Bliss Avenue, both in Saginaw, Michigan and 497 Union Avenue in Providence – were purchased within one month's time (1/23/23; 2/15/23; and 2/27/23, respectively). The source of the funds for these quick, expensive purchases is unknown, but all three purchases were made a year after Perez's February 2022 arrest and while Correa still resided in Perez's family's Cranston home with Perez's mother and sister. After her arrest and prior to sentencing, Correa sold two of these properties – 1411 Bliss Street in Saginaw, Michigan in February 2024 and 2212 Mackinaw Street in Saginaw in January 2026.

Correa's self-reported, and unverified, financial report is silent about what she did with the proceeds from either sale. That said, per Probation, a public records search shows that on January 12, 2026, Correa sold 2212 Mackinaw Street in Saginaw to her current boyfriend (PSR ¶ 111) in an arm's length transaction. In that same vein, in her recent financials provided to Probation in anticipation of sentencing, the defendant disclosed a "loan" to Rano, LLC in the amount of $28,000. The defendant failed to disclose to Probation – and in turn, this Court – that "Rano LLC" (per the Rhode Island Secretary of State website) is in fact a real estate investment company created in August 2024 in the name/address of her current boyfriend.[2] The government notes that Correa "sold" the 2212 Mackinaw Street property last month to her boyfriend for

_____

[2] The government notes that at the time of her presentence investigation interview, held in August 2025, Correa indicated she was in a one-year relationship with her current boyfriend.

barely any profit given that she purchased it for $38,000 and "sold" it for $50,000 (to her boyfriend, to whom she loaned his LLC $28,000 at an undisclosed time).

The fourth property that Correa mentioned at the time of her arrest that she owned – 46 Calder Street in Providence –is in the name of Sterling Real Estate, LLC, an LLC created by Correa in August 2023 with a business address of the Perez family's Cranston home, in which Correa still resides. Correa self-reported to Probation in her pretrial services interview that this Providence property was worth over $173,000. The financials provided to Probation in advance of sentencing (albeit delayed) are silent about this asset – meaning, there is no information related to whether Correa sold the property (and if so, what happened with those proceeds) or if she is deliberately not disclosing it to Probation. Additionally, Correa's more recent financial disclosure does not detail what happened to two truck/trailers that she previously listed as assets, whether she sold the trucks/trailers and if so, what happened with the money.

In light of the lack of candor about her financial circumstances, the defendant has not met her burden that she is unable to pay a fine. "The defendant bears the burden of demonstrating that [her] case warrants an exception to the rule that a fine be imposed." *United States v. Peppe*, 80 F.3d 19, 22 (1st Cir. 1996) (*citing United States v. Savoie,* 985 F.2d 612, 620 (1st Cir. 1993)). *See also* U.S.S.G. § 5E1.2(a) ("The court shall impose a fine in all cases, except where the defendant establishes that [s]he is unable to pay and is not likely to become able to pay any fine."). Even if a defendant's net worth is negative—and that is not the case here—a fine may be appropriate given other factors. *See, e.g., Peppe*, 80 F.3d at 23 (finding that "although it is undisputed that [defendant's] net worth and monthly cash flow are negative, these facts alone do not compel the conclusion that a fine should not be imposed. Rather, it was [defendant's] burden to establish that he was not able to pay the fine, with or without a reasonable installment

schedule. At no time did [defendant] offer evidence to establish his inability to pay, and his inability to pay does not follow inexorably from the facts in the record…Further, [defendant] does not address his future ability to pay the fine, and given his age, good health, and past employment experience, he cannot complain in this regard").  In light of Correa's continued deceit and misleading information, this Court should impose a fine.

## C. The Remaining § 3553(a) Factors Further Support the Government's Recommendation

The lengthy discussion about the nature and circumstances of the offense and the defendant's history and characteristics hopefully conveys to the Court why the sentencing factors set forth in § 3553(a) support the sentence recommended by the government.  Correa was fully aware that leading up to Perez's arrest, he was one of the biggest fentanyl traffickers in New England. Like she has continuously tried to deceive the public and separate her public image from her private actions, Correa lied to law enforcement about her knowledge of Perez's drug trafficking. It was not until law enforcement pieced together financial records, interviewed witnesses, and analyzed court-authorized interceptions that it became abundantly clear that Correa not only fully knew about Perez's drug trafficking, but she embraced it for her own financial gain and served as the brains behind – and the leader of – the concealment of his dirty money. Correa saw the lucrative nature of her boyfriend's dangerous and illegal business as an opportunity for her own financial stability. Instead of using her work with nonprofits and lower income communities as a moral boundary that discouraged wrongdoing, Correa treated it as unrelated – or even as cover – while continuing to launder her boyfriend's drug money for her own personal gain. This choice by her reflected a continued conscious decision to prioritize self-interest over integrity. As with anyone that logically chooses to engage in criminal activity, deeming it more lucrative than other available legitimate work, when their illegal activity is

detected, it is critical as a matter of deterrence – both specific and general – that Correa face significant consequences for his actions.

### D. The Need to Avoid Unwarranted Sentencing Disparities

The government is mindful that its sentencing recommendation of 5.5 years in prison is a significant sentence for a first-time offender like Correa. Indeed, such a recommendation reflects a substantial downward variance from the GSR of 87-108 months. As stated above, there is no dispute that Probation correctly calculated the guidelines, and Correa is appropriately ineligible for a zero-point offender reduction because of her leadership role in the money laundering conspiracy. Additional facts learned during the presentence process, particularly the defendant's lack of candor about her finances, strengthen the government's position that no more than a slight variance from the low-end guideline range is appropriate. Likewise, the JSIN data included by Probation further supports the government's request for a slight variance because anything more would yield unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6).

"During the last five fiscal years (FY2020-2024), there were 106 defendants whose primary guideline was § 2S1.1, with a Final Offense Level of 29 and a Criminal History Category of I." PSR ¶ 139. "For the 104 (98%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 63 month(s) and the median length of imprisonment imposed was 70 month(s)." *Id.* The government's recommendation falls squarely between both the average and median length of imprisonment for 98% of defendants sentenced under this guideline. This data suggests that the government's recommendation of 66 months is reasonable, and any further variance would create unwarranted disparities with like and similar defendants.

To be sure, the defendant was the person closest to one of the most culpable fentanyl

traffickers this Court has ever sentenced. As evident from the undisputed facts detailed in Correa's PSR, Correa knew about Perez's drug dealing and helped him launder – for her own benefit – hundreds of thousands of dollars of his illicit drug proceeds.  Like most drug dealers that appear before the courts in this district, most of Perez's dirty money still is unaccounted for. Sophisticated money launderers, like Correa, ensure that the illicit drug proceeds go undetected from law enforcement.

Despite her closeness to Perez and knowledge of his drug dealing, in February 2022 during the execution of search warrants on her home and other addresses tied to Perez's drug dealing, Correa misled law enforcement and claimed surprise at the possibility that he was a large-scale drug trafficker. PSR ¶ 20.  More recently, the government contends that Correa is misleading Probation – and in turn this Court – in her delayed financial statement. That she continues to conceal important information from Probation is an aggravating factor, and not a mitigating one. An even greater downward variance – which the government understands will be requested by the defendant – is simply not supported by what is known about either the Correa's crime or her personal characteristics.

Indeed, the government is mindful that a sentence of five and a half years is a significant one for a first-time offender, but it is a reasonable recommendation, particularly considering the JSIN data for like and similar offenders, her leadership role in laundering her boyfriend's drug money, and what amounts to clearly aggravating factors related to the defendant's post-arrest activity. Anything less would create unwarranted disparities.

### III.    CONCLUSION

A sentence of five and a half years – a 24% downward variance from the GSR – reflects the seriousness of the offense, promotes respect for the law, provides just punishment, and

affords adequate deterrence to criminal conduct. In other words, such a sentence is sufficient but not greater than necessary to achieve the goals of sentencing and is proportionate to sentences of similarly situated defendants.

Thus, for the reasons stated in this memorandum and those to be advanced at the sentencing hearing, the government recommends that the Court sentence Correa to 66 months in custody, to be followed by 36 months of supervised release. In addition, the Court should order forfeiture to the extent detailed in the motion for money judgment and preliminary orders of forfeiture. Lastly, the Court should consider a fine in the guideline range, even if just a principled matter, because Correa – who retained private counsel – has not met her burden that she is unable to pay a fine in the incomplete, and late-disclosed financial documents that she provided.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    */s/ Lindsey E. Weinstein*
LINDSEY E. WEINSTEIN
KUNAL PASRICHA
Assistant U.S. Attorneys
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Lindsey E. Weinstein*
LINDSEY E. WEINSTEIN
Assistant United States Attorney

Date: February 2, 2026